CANTEY HANGER, LLP, Petitioner,

v.

Philip Gregory BYRD, Lucy Leasing
Co., L.L.C., and PGB Air, Inc.,
Respondents

No. 13–0861

Supreme Court of Texas.

Argued December 4, 2014

OPINION DELIVERED: June 26, 2015

Rehearing Denied September 11, 2015

Lindsey Rames, Dallas, for Respondents.

Stephen L. Tatum, Joseph W. Spence, Lisa Vaughn Lumley, Fort Worth, Melvin Keith Ogle, for Petitioner.

Justice Lehrmann delivered the opinion of the Court, in which Justice Guzman, Justice Boyd, Justice Devine, and Justice Brown joined.

This case concerns the scope of attorneys' immunity from civil liability to non-clients. Following the trial court's entry of a divorce decree, one of the divorce litigants sued opposing counsel for fraud and related claims in connection with the law firm's alleged preparation of a document to effectuate the transfer of personal property awarded to its client in the decree. Specifically, the litigant alleged that the document contained misrepresentations and that the firm structured the property's transfer in a manner that shifted certain tax liabilities to the litigant in contravention of the decree. The law firm moved for summary judgment, arguing that it was immune from liability to a non-client for conduct within the scope of representation of its client in the divorce proceedings. The trial court granted the motion, but the court of appeals reversed, holding that the firm's alleged conduct was unrelated to the divorce litigation and that the firm had not conclusively established its entitlement to immunity. We hold that the firm established its affirmative defense of attorney immunity as a matter of law and therefore reverse the court of appeals' judgment.

## I. Background

Philip Byrd and Nancy Simenstad commenced divorce proceedings in 2006. Simenstad was represented in the divorce proceedings by Vick, Carney & Smith, LLP, and then by Cantey Hanger, LLP. The divorce proceedings were highly contentious, but in August 2008 the parties settled, resulting in the trial court's entry of an agreed divorce decree.

The decree awarded Simenstad three aircraft as her separate property, including a Piper Seminole that had been owned by Lucy Leasing Co., LLC, a company the decree awarded to Byrd. The decree also made Simenstad responsible for all ad valorem taxes, liens, and assessments on the aircraft. Finally, the decree ordered the parties to "execute with[in] ten days from the entry of this decree any documents necessary to effectuate the transfers contemplated herein, which shall include ... documents necessary to transfer ownership of airplanes and the like." The "attorney for the non-signing party" was ordered to "draft the documents necessary to effectuate the transfers contemplated [in the decree]." The record does not reflect, and no party asserts, that any transfer documents regarding the Piper Seminole at issue were executed within the time frame specified in the decree.

Byrd, Lucy Leasing, and PGB Air, Inc. (another company awarded to Byrd in the decree) sued Simenstad and Cantey Hanger,[1] alleging in pertinent part that, over a year after the decree was entered, Simenstad and Cantey Hanger falsified a bill of sale transferring the Piper Seminole from Lucy Leasing to a third party. Specifically, the plaintiffs alleged that Simenstad executed the bill of sale as "Nancy Byrd," a "manager" of Lucy Leasing, even though her last name had previously been legally changed to Simenstad and she "was never an owner, officer, or manager" of Lucy Leasing. They brought claims against Cantey Hanger for fraud, aiding and abet-

---

1. Byrd also sued Vick Carney, but the trial court granted summary judgment in Vick Carney's favor, and Byrd did not seek review of that order. 409 S.W.3d 772, 775 (Tex. App.–Fort Worth 2013).

ting, and conspiracy, asserting that Cantey Hanger falsified the bill of sale in order to shift tax liability for the Piper Seminole from Simenstad to Byrd in contravention of the decree.[2] Cantey Hanger answered with a general denial, a verified denial, and several affirmative defenses, including "litigation immunity or other common law immunity doctrines."

Cantey Hanger moved for summary judgment on attorney-immunity grounds, arguing that it owed no duty to Byrd or the other plaintiffs and that as a matter of law it was not liable to the plaintiffs for actions taken in the course and scope of its representation of Simenstad in the divorce proceeding.[3] Exhibits to Cantey Hanger's motion included the decree and affidavits from two Cantey Hanger attorneys attesting that Cantey Hanger was retained to represent Simenstad in the divorce proceedings and that "[a]ll actions taken by Cantey Hanger with respect to Plaintiffs were made in the course and scope of representing Ms. Simenstad." [4]

The plaintiffs responded that Cantey Hanger's conduct—"[c]onspiring with and aiding a client to falsify documents [and] evade tax liability"—was "wrongful," was not "part of the discharge of [Cantey Hanger's] duties in representing [its] client," and thus was not protected by attorney immunity. They argued more broadly that the claims against Cantey Hanger "should be permitted because they involve fraudulent conduct." In an affidavit submitted as an exhibit to the response, Byrd testified that he had never received documents from Cantey Hanger to sign in order to effectuate the transfer of the Piper Seminole from Lucy Leasing to Simenstad, that he discovered the plane had been transferred directly to 'a third party, that Simenstad had signed the bill of sale as manager of Lucy Leasing even though he was the sole manager, that the plane was still registered to Lucy Leasing, and that the transaction made Lucy Leasing responsible for the sales tax.[5]

The trial court granted Cantey Hanger's summary-judgment motion and dismissed all claims against it with prejudice. The court of appeals reversed as to the fraud, aiding-and-abetting, and conspiracy claims relating to the sale of the plane. 409 S.W.3d at 782–83. The court held that, although attorneys enjoy qualified immunity from civil liability to non-clients for actions taken in connection with representing a client in litigation, Cantey Hanger was not entitled to such immunity. *Id.* at 779–81. The court concluded that Cantey Hanger's allegedly fraudulent conduct involving the "subsequent sale" of the plane awarded to Simenstad "was not required by, and had nothing to do with, the divorce decree," and thus was "outside the scope

2. With respect to Cantey Hanger, the plaintiffs also alleged various other acts of misconduct and asserted claims of defamation, unfair debt collection practices, and intentional infliction of emotional distress. The trial court dismissed those claims on summary judgment, Byrd did not appeal the dismissal of the defamation and debt-collection claims, and the court of appeals affirmed the dismissal of the emotional-distress claim. Accordingly, those claims are no longer at issue. *Id.* at 776, 782.

3. Cantey Hanger did not file a no-evidence summary-judgment motion.

4. One of the attorneys also stated that Cantey Hanger sought postjudgment remedies on Simenstad's behalf in the divorce and represented Simenstad in Byrd's bankruptcy proceedings, but those proceedings appear unrelated to the alleged conduct at issue.

5. The bill of sale at issue is not in the summary-judgment record. The plaintiffs attached it as an exhibit to their response, but the trial court struck it as not properly authenticated, and that order was not appealed.

of representation of a client." *Id.* at 781. The dissent in that court would have held that Cantey Hanger "established as a matter of law that its conduct was within the course of its representation of its client in the underlying divorce litigation against Byrd" and was thus entitled to summary judgment on its immunity defense. *Id.* at 788, 790 (Gardner, J., dissenting). We granted Cantey Hanger's petition for review to address the parties' dispute over the scope and application of the attorney-immunity doctrine.

## II. Standard of Review

We review a grant of summary judgment de novo. *State v. Ninety Thousand Two Hundred Thirty–Five Dollars & No Cents in U.S. Currency ($90,235)*, 390 S.W.3d 289, 292 (Tex.2013). A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex.2009). "When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Attorney immunity is an affirmative defense. *Sacks v. Zimmerman*, 401 S.W.3d 336, 339–40 (Tex.App.–Houston [14th Dist.] 2013, pet. denied). Therefore, to be entitled to summary judgment, Cantey Hanger must have proven that there was no genuine issue of material fact as to whether its conduct was protected by the attorney-immunity doctrine and that it was entitled to judgment as a matter of law.

## III. Attorney Immunity

Texas common law is well settled that an attorney does not owe a profes-sional duty of care to third parties who are damaged by the attorney's negligent representation of a client. *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex.1996); *see also McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex.1999) (explaining that a lack of privity precludes attorneys' liability to non-clients for legal malpractice). However, Texas courts have developed a more comprehensive affirmative defense protecting attorneys from liability to non-clients, stemming from the broad declaration over a century ago that "attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex.Civ.App. 1910, writ ref'd). This attorney-immunity defense is intended to ensure "loyal, faithful, and aggressive representation by attorneys employed as advocates." *Mitchell v. Chapman*, 10 S.W.3d 810, 812 (Tex. App.–Dallas 2000, pet. denied).

In accordance with this purpose, there is consensus among the courts of appeals that, as a general rule, attorneys are immune from civil liability to non-clients "for actions taken in connection with representing a client in litigation." *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex.App.–Houston [1st Dist.] 2005, pet. denied); *see also Toles v. Toles*, 113 S.W.3d 899, 910 (Tex.App.–Dallas 2003, no pet.); *Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 287–88 (Tex.App.– Fort Worth 1997, pet. denied). Even conduct that is "wrongful in the context of the underlying suit" is not actionable if it is "part of the discharge of the lawyer's duties in representing his or her client." *Toles*, 113 S.W.3d at 910–11; *Alpert*, 178 S.W.3d at 406; *see also Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer &*

*Oshman, P.C.*, No. 01–06–00696–CV, 2008 WL 746548, at *7 (Tex.App.–Houston [1st Dist.] March 20, 2008, pet. denied) (mem. op. on reh'g) ("[A]n attorney cannot be held liable to a third party for conduct that requires the office, professional training, skill, and authority of an attorney." (citation and internal quotation marks omitted)). However, other mechanisms are in place to discourage and remedy such conduct, such as sanctions, contempt, and attorney disciplinary proceedings. *Reagan Nat'l Adver. of Austin, Inc. v. Hazen*, No. 03–05–00699–CV, 2008 WL 2938823, at *3 (Tex.App.–Austin July 29, 2008, no pet.) (mem.op.); *see also Renfroe*, 947 S.W.2d at 287 ("If an attorney's conduct violates his professional responsibility, the remedy is public, not private.").[6]

▆ Conversely, attorneys are not protected from liability to non-clients for their actions when they do not qualify as "the kind of conduct in which an attorney engages when discharging his duties to his client." *Dixon Fin. Servs.*, 2008 WL 746548, at *9; *see also Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 442 (Tex.App.–Houston [14th Dist.] 2000, pet. denied) (noting that "it is the kind of conduct that is controlling, and not whether that conduct is meritorious or sanctionable"). For example,

we have held that an attorney "will not be heard to deny his liability" for the damages caused by his participation in a fraudulent business scheme with his client, as "such acts are entirely foreign to the duties of an attorney." *Poole v. Hous. & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882); *see also Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 382 (Tex.App.–Houston [1st Dist.] 2012, pet. denied) (holding that attorneys were not immune from claims that they knowingly assisted their clients in evading a judgment through a fraudulent transfer). And the courts of appeals have identified examples of attorney conduct that, even if it occurred during a lawsuit, would be actionable because it does not involve the provision of legal services and would thus fall outside the scope of client representation. *See, e.g., Bradt v. West*, 892 S.W.2d 56, 72 (Tex.App.–Houston [1st Dist.] 1994, writ denied) (noting that a claim against an attorney for assaulting opposing counsel during trial would be actionable, as such conduct "is not part of the discharge of an attorney's duties in representing a party").

In this case, the parties dispute whether Cantey Hanger has conclusively proven that its alleged conduct with respect to the sale of the plane was part of the discharge of its duties in representing Simenstad in

---

6. The majority of Texas cases addressing attorney immunity arise in the litigation context. But that is not universally the case. In *Campbell v. Mortgage Electronic Registration Systems, Inc.*, for example, the court of appeals held that attorneys hired to assist a mortgage beneficiary in the nonjudicial foreclosure of real property were immune from the borrowers' suit for wrongful foreclosure. No. 03–11–00429–CV, 2012 WL 1839357, at *6 (Tex.App.–Austin May 18, 2012, pet. denied) (mem.op.); *see also Hazen*, 2008 WL 2938823, at *8 (noting that "neither the case law, nor the [attorney-immunity] doctrine's underlying policy rationales, are limited to [the litigation] setting"). Because we conclude that Cantey Hanger's alleged conduct

falls within the scope of its duties in representing its client in litigation, we need not consider the attorney-immunity doctrine's application to an attorney's conduct that is unrelated to litigation but nevertheless falls within the ambit of client representation and "requires the office, professional training, skill, and authority of an attorney.". *See Dixon Fin. Servs.*, 2008 WL 746548, at *7. The dissent thus mischaracterizes the scope of our opinion in asserting that we "suggest[ ] that this form of attorney immunity applies outside of the litigation context." *Post* at 489. We cite *Campbell* and *Hazen* merely as examples of cases in which courts have applied attorney immunity (or indicated that it could apply) outside the litigation context.

the divorce proceedings or, instead, was independent of the divorce and foreign to the duties of an attorney. In *Chu v. Hong,* we recognized that "[a]n attorney who personally steals goods or tells lies on a client's behalf may be liable for conversion or fraud in some cases."[7] 249 S.W.3d 441, 446 (Tex.2008). To that end, some courts of appeals have broadly stated that attorney immunity does not extend to an attorney's knowing participation in fraudulent activities on his client's behalf. *E.g., Toles,* 113 S.W.3d at 911; *Querner v. Rindfuss,* 966 S.W.2d 661, 666 (Tex.App.–San Antonio 1998, pet. denied) ("An attorney . . . is liable if he knowingly commits a fraudulent act or knowingly enters into a conspiracy to defraud a third person."). However, other courts have taken a narrower approach to this so-called fraud exception, holding that an attorney's knowing commission of a fraudulent act "outside the scope of his legal representation of the client" is actionable. *Dixon Fin. Servs.,* 2008 WL 746548, at *8; *Hazen,* 2008 WL 2938823, at *3; *Alpert,* 178 S.W.3d at 406. These courts go on to explain that an attorney's participation in "independently fraudulent activities" is considered "foreign to the duties of an attorney" and is not shielded from liability. *Alpert,* 178 S.W.3d at 406 (citing *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.App.–Houston [1st Dist.] 1985, no writ)); *see also Cunningham v. Tarski,* 365 S.W.3d 179, 192 (Tex.App.–Dallas 2012, pet. denied) (holding that there was no genuine issue of material fact as to whether the defendant's conduct was "the type of fraudulent conduct that is foreign to the duties of an attorney").

 We think the latter view is consistent with the nature and purpose of the attorney-immunity defense. An attorney is given latitude to "pursue legal rights that he deems necessary and proper" precisely to avoid the inevitable conflict that would arise if he were "forced constantly to balance his own potential exposure against his client's best interest." *Alpert,* 178 S.W.3d at 405 (citing *Bradt,* 892 S.W.2d at 71–72). Because the focus in evaluating attorney liability to a non-client is "on the kind—not the nature—of the attorney's conduct," a general fraud exception would significantly undercut the defense.[8] *Dixon Fin. Servs.,* 2008 WL 746548, at *8. Merely labeling an attorney's conduct "fraudulent" does not and should not remove it from the scope of client representation or render it "foreign to the duties of an attorney." *Alpert,* 178 S.W.3d at 406 (citing *Poole,* 58 Tex. at 137); *see also Dixon Fin. Servs.,* 2008 WL 746548, at *9 ("Characterizing an attorney's action in advancing his client's rights as fraudulent does not change the rule that an attorney cannot be held liable for discharging his duties to his client.").

 Moreover, characterizing fraudulent conduct as an "exception" to the attorney-immunity defense brings unnecessary confusion and complexity to the analysis. In this case, for example, the

---

7. In *McCamish,* we held that an attorney can be liable to a non-client for negligent misrepresentation where "an independent duty to the nonclient [arises] based on the [attorney's] manifest awareness of the nonclient's reliance on the misrepresentation and the [attorney's] intention that the nonclient so rely." 991 S.W.2d at 792. The plaintiffs do not assert such a claim here.

8. We noted in *Chu* that fraud claims "against an opposing attorney in litigation" generally are not actionable because "reliance in those circumstances" is not justifiable. 249 S.W.3d at 446 n.19; *see also McCamish,* 991 S.W.2d at 794 ("Generally, courts have acknowledged that a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context.").

parties agree that Cantey Hanger bore the initial burden of proof to establish its immunity defense, but dispute the effect of the plaintiffs' fraud allegations on that burden. Specifically, they dispute whether negating the allegations was part of Cantey Hanger's evidentiary burden, or whether the burden shifted to the plaintiffs to present sufficient evidence to raise a fact issue on the fraud claims.[9] But we see no reason to engage in a burden-shifting analysis. Fraud is not an exception to attorney immunity; rather, the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation. An attorney who pleads the affirmative defense of attorney immunity has the burden to prove that his alleged wrongful conduct, regardless of whether it is labeled fraudulent, is part of the discharge of his duties to his client. *E.g., Dixon Fin. Servs.,* 2008 WL 746548, at *9; *see also Alpert,* 178 S.W.3d at 408 (holding that a claim against an attorney for conspiracy to defraud was not actionable where "the complained-of actions involve the filing of lawsuits and pleadings, the providing of legal advice upon which the client acted, and awareness of settlement negotiations—in sum, acts taken and communications made to facilitate the rendition of legal services to [the client]").

## IV. Application

■ Cantey Hanger is entitled to summary judgment on its immunity defense if it conclusively established that its alleged conduct was within the scope of its legal representation of Simenstad in the divorce proceedings. We hold that it did. The relevant allegations in Byrd's petition may be summarized as follows: (1) the divorce decree awarded Simenstad the aircraft at issue and assigned responsibility for the plane's ad valorem taxes, liens, and assessments to Simenstad; (2) the decree directed Simenstad's attorneys to prepare necessary documents to effectuate the plane's transfer from Lucy Leasing to Simenstad; (3) Cantey Hanger assisted Simenstad in executing a bill of sale of the plane from Lucy Leasing directly to a third party;[10] (4) the bill of sale was signed by "Nancy Byrd," a "manager" of Lucy Leasing; (5) Simenstad's name had been legally changed from Byrd back to Simenstad before she signed the document, and she had no authority to act on Lucy Leasing's behalf; and (6) by transferring the plane directly to a third party, the bill of sale shifted liability for the taxes on the plane to Lucy Leasing (and thus to Byrd) in contravention of the decree.

9. The dissent in the court of appeals opined that "once Cantey Hanger established as a matter of law that its conduct was within the course of its representation of its client in the underlying divorce litigation against Byrd, it established its affirmative defense of immunity as a matter of law and ... the burden shifted to Byrd to plead and present evidence raising a fact issue regarding the fraud exception." 409 S.W.3d at 788 (Gardner, J., dissenting) (citing *Hazen,* 2008 WL 2938823, at *8–10). The dissent then effectively concluded that no evidence supports the plaintiffs' fraud claim. *Id.* at 788–89. But a no-evidence review renders the attorney-immunity analysis wholly unnecessary. As noted above, Cantey Hanger did not move for a no-evidence summary judgment on the plaintiffs' claims, and whether the plaintiffs have raised a fact issue as to the elements of those claims is not before us.

10. The nature of Cantey Hanger's alleged participation in the sale of the plane and the evidence supporting it are unclear. Again, however, any shortfalls in the evidence supporting the plaintiffs' claims are not before us.

The court of appeals concluded that, based on these allegations, "[t]he subsequent sale of the airplane to a third party after it had already been awarded to [Simenstad] in the agreed decree was not required by, and had nothing to do with, the divorce decree." 409 S.W.3d at 781. The dissent agrees with this characterization; we do not. Byrd essentially complains that the manner in which Cantey Hanger carried out a specific responsibility assigned to it by the divorce decree—transferring ownership of the plane awarded to Simenstad—caused tax liabilities to be imposed on the parties to the divorce in a way that violated the decree. Meritorious or not, the *type* of conduct alleged falls squarely within the scope of Cantey Hanger's representation of Simenstad in the divorce proceedings.[11] *Alpert*, 178 S.W.3d at 406 ("The immunity focuses on the type of conduct, not on whether the conduct was meritorious in the context of the underlying lawsuit.").

▬▬ Indeed, the court of appeals stated, and we agree, that "Cantey Hanger's preparation of a bill of sale to facilitate transfer of an airplane awarded to its client in an agreed divorce decree was conduct in which an attorney engages to

discharge his duties to his client" and was not "foreign to the duties of an attorney." 409 S.W.3d at 780. Yet the court went on to hold that the complained-of conduct—intentional misrepresentations in the bill of sale made for the purpose of shifting tax liability from Simenstad to Lucy Leasing and Byrd—was outside the scope of Cantey Hanger's duties to its client. This simply does not follow. The *type* of conduct described in these two statements is the same; the only difference is the added detail in the latter description that makes the conduct "wrongful." Again, an attorney's conduct may be wrongful but still fall within the scope of client representation. *E.g.*, *Renfroe*, 947 S.W.2d at 287–88 (holding that attorneys were not liable to opposing parties for filing a wrongful garnishment action). We hold that Cantey Hanger has conclusively established that its alleged conduct was within the scope of its representation of Simenstad in the divorce proceedings, was not foreign to the duties of an attorney, and is thus protected by attorney immunity.[12]

We note that the court of appeals remanded the plaintiffs' fraud claims against Simenstad to the trial court. To the extent Lucy Leasing is determined to be

11. To the extent the court of appeals concludes that the parties were no longer adversarial, apparently merely because the divorce decree had already been entered, we disagree. As noted above, the parties engaged in post-judgment enforcement proceedings relating to other aspects of the decree, compliance with which continued to be a source of disagreement. Indeed, at the time the bill of sale was executed, Cantey Hanger was well past the ten-day deadline to prepare the transfer documents. Byrd could have filed a motion to enforce or for sanctions at any point, but chose not to.

12. The dissent references the judicial-proceedings privilege as support for its conclusion that attorney immunity does not apply to Cantey Hanger's alleged conduct. *Post* at

492. That privilege insulates "[c]ommunications in the due course of a judicial proceeding" or in "serious contemplation" of such a proceeding from defamation claims. *James v. Brown*, 637 S.W.2d 914, 916 (Tex.1982); *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 655 (Tex.2015). The privilege is not limited to attorneys, but covers "any statement made by the judge, jurors, counsel, parties or witnesses, ... including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *James*, 637 S.W.2d at 916–17 ("The administration of justice requires full disclosure from witnesses, unhampered by fear of retaliatory suits for defamation."). The privilege is an independent doctrine serving independent purposes, and it has not been raised in these proceedings.

legally responsible for taxes that Simenstad rightfully owes, its remedy is against Simenstad, not Cantey Hanger.[13] *See Dixon Fin. Servs.*, 2008 WL 746548, at *9 (holding that the attorneys of a prevailing party in arbitration were not subject to personal liability to the opposing party for allegedly misrepresenting the scope of the arbitration award to a third party in an attempt to satisfy the award); *see also Renfroe*, 947 S.W.2d at 287 ("If an attorney's conduct violates his professional responsibility, the remedy is public, not private.").

## V. Conclusion

Cantey Hanger has conclusively established that it is immune from civil liability to the plaintiffs and that the trial court's grant of summary judgment was proper. Accordingly, we reverse that portion of the court of appeals' judgment relating to the fraud, aiding-and-abetting, and conspiracy claims against Cantey Hanger and reinstate the trial court's judgment.

Justice Green filed a dissenting opinion, in which Chief Justice Hecht, Justice Johnson, and Justice Willett joined.

Justice Green joined by Chief Justice Hecht, Justice Johnson, and Justice Willett, dissenting.

The Court holds that Cantey Hanger conclusively established its affirmative defense of attorney immunity because its alleged conduct occurred within the scope of its representation of Simenstad in the divorce proceeding. 467 S.W.3d 477, 480.

While I agree with much of the Court's description of the attorney immunity doctrine and the purposes underlying it, I think the Court overlooks an important element of the form of attorney immunity at issue in this case—that the attorney's conduct must have occurred in litigation—and applies the attorney immunity doctrine in a manner that results in a much broader, more expansive liability protection. I would hold that Cantey Hanger's summary judgment evidence failed to conclusively establish that its alleged conduct occurred in litigation and that summary judgment was therefore improper. I would affirm the court of appeals' judgment.

The circumstances in which lawyers may be subject to civil liability to nonclients are wide and varied. *See, e.g.,* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 56 (2000) ("[A] lawyer is subject to liability to a client or nonclient when a nonlawyer would be in similar circumstances."). To ensure that attorneys may practice their profession effectively and zealously advocate for their clients without subjecting themselves to claims from nonclients, rules have developed to protect certain attorney conduct from civil liability. To fully understand these rules and the effect of the Court's opinion on them, it is important to review the development of the attorney immunity doctrine.

In Texas, the attorney immunity doctrine, as it applies to litigation or other related proceedings, has developed under two closely related legal theories.[1] The

---

13. The court of appeals held that the plaintiffs' claims against Simenstad "are not enforcement claims for which the divorce court has exclusive, continuing jurisdiction." 409 S.W.3d at 776. Simenstad did not file a petition for review, and we therefore express no opinion on this holding.

1. There are additional legal theories that preclude liability for an attorney's otherwise actionable conduct. For example, the rule of privity generally prevents third parties from suing an attorney for legal malpractice in any context. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex.1999) (recognizing the general

first, on which the Court purports to rely, originated more than a century ago with the broad declaration that "attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex.Civ. App.–Dallas 1910, writ ref'd). Because the courts of appeals analyzing attorney immunity under *Kruegel* generally require the attorney's conduct to have occurred in the litigation context, I refer to this theory as "litigation immunity." *See, e.g., Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 287–88 (Tex.App.–Fort Worth 1997, writ denied); *Bradt v. West*, 892 S.W.2d 56, 72 (Tex. App.–Houston [1st Dist.] 1994); *Morris v. Bailey*, 398 S.W.2d 946, 947–48 (Tex.Civ. App.–Austin 1966, writ ref'd n.r.e.). Under the second theory, although not raised expressly here but nevertheless important to the context of attorney immunity in Texas, any statement made in the due course of or in serious contemplation of a judicial or quasi-judicial proceeding is absolutely privileged and cannot serve as the basis for a defamation lawsuit. *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 655, 2015 WL 2328678 (Tex.2015); *James v. Brown*, 637 S.W.2d 914, 916 (Tex.1982) (per curiam). I refer to this theory as the "judicial proceedings privilege."

Nearly thirty years before *Kruegel*, this Court adopted the Texas Commission of

Appeals' opinion in *Poole v. Houston & T.C. Railway Co.*, 58 Tex. 134 (1882). In that case, a seller sought to stop the shipment of goods that had been sold on credit to an insolvent buyer. *Id.* at 135. The buyer and its attorney then engaged in a fraudulent scheme designed to prevent the seller from stopping the shipment. *See id.* at 135, 137. In its simplest form, the scheme required the buyer to fraudulently assign a bill of lading to the attorney, the attorney to intercept the goods by presenting the fraudulent bill of lading to a railroad station agent, and the attorney to return the goods to the buyer. *See id.* Following the successful execution of the scheme, the seller sued the attorney for fraud and tried the lawsuit to a jury. *See id.* The trial court charged the jury "that, to make the defendant [attorney] liable, it must be shown by the evidence that he was acting, not as agent of [his client], but for himself." *Id.* This Court held that the trial court's charge was erroneous because it stated that the attorney could not be liable for fraud committed at the behest of his principal. *Id.* at 137–38. More important to the issue presented today, the Court held that the attorney was not immune from civil liability because his fraudulent scheme was "entirely foreign to the duties of an attorney." *Id.* at 137.

The opinion in *Kruegel* was authored against this backdrop. In *Kruegel*, the plaintiff sued a law firm for "conspiracy,

---

rule and an exception to the general rule based on an attorney's negligent misrepresentations); *Barcelo v. Elliott*, 923 S.W.2d 575, 577–79 (Tex.1996). Moreover, a third party's reliance on an attorney's representations made in certain adversarial contexts might be unjustified as a matter of law. *See Chu v. Hong*, 249 S.W.3d 441, 446 n.19 (Tex.2008); *McCamish, Martin, Brown & Loeffler*, 991 S.W.2d at 794 ("Generally, courts have acknowledged that a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversari-

al context."). For other possible examples of immunities or defenses available to an attorney, the comments to the Restatement (Third) of the Law Governing Lawyers section 56 and the entirety of section 57 are instructive. Because there are multiple legal theories that might preclude an attorney's liability, I believe that parties and courts should clearly articulate the theory and authority on which they rely because the label "attorney immunity"—as Cantey Hanger asserted here–is imprecise.

fraud, and perjury of defendants and their counsel ... by which plaintiff wrongfully and unlawfully suffered an adverse judgment wholly beyond his control." *Kruegel,* 126 S.W. at 344. Specifically, the plaintiff alleged that the attorneys and other defendants "knew that plaintiff had a good, legal, valid, and meritorious cause of action," and that the defendants defeated the plaintiff's underlying cause of action through "concerted action and undue influence and unlawful misuse and usurpation of power of a court." *Id.* The plaintiff further alleged that the defendants, knowing that the plaintiff would pursue an appeal, "unlawfully conspired ... to defeat plaintiff's appeal." *Id.* The trial court sustained the law firm's special exceptions, and the court of appeals affirmed. *Id.* at 344–45. In doing so, the court of appeals held that "attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Id.* at 345.

A comparison of *Kruegel* and *Poole* is critical to understanding the context in which litigation immunity applies. In both cases, the attorney or law firm allegedly engaged in conduct that would be actionable without attorney immunity. The only meaningful distinction between the outcomes is the context in which that conduct occurred. In *Kruegel,* the conduct occurred in litigation, while in *Poole* the conduct occurred outside of any litigation. In my view, the only way to reconcile these cases and give meaning to the purpose behind attorney immunity is to require the defendant–attorney's conduct to have occurred in litigation.

Despite clearly announcing litigation immunity's existence, the court in *Kruegel* did little to define its scope and this Court has not, until today, readdressed the issue. The courts of appeals, however, have

agreed with my view of *Kruegel* and *Poole* and generally require the attorney's conduct to have occurred in litigation for litigation immunity to apply. *See, e.g., Renfroe,* 947 S.W.2d at 287–88; *Bradt,* 892 S.W.2d at 72; *Morris,* 398 S.W.2d at 947–48. Moreover, the courts of appeals require the attorney's conduct to involve the provision of legal services. *See, e.g., Gaia Envtl., Inc. v. Galbraith,* 451 S.W.3d 398, 404 (Tex.App.–Houston [14th Dist.] 2014, pet. denied) (noting that litigation immunity would not apply if an attorney were to physically assault the opposing parting during trial); *Bradt,* 892 S.W.2d at 72 (same). To address the type of concern raised in *Gaia Environmental, Inc.,* federal courts applying Texas law require the attorney's conduct to involve "the office, professional training, skill, and authority of an attorney." *See, e.g., Miller v. Stonehenge/Fasa–Tex., JDC, L.P.,* 993 F.Supp. 461, 464 (N.D.Tex.1998) (citing *Taco Bell Corp. v. Cracken,* 939 F.Supp. 528, 532 (N.D.Tex.1996)). The courts of appeals have extended litigation immunity to both an attorney's conduct and statements. *See, e.g., Alpert v. Crain, Caton & James, P.C.,* 178 S.W.3d 398, 405 (Tex.App.–Houston [1st Dist.] 2005, pet. denied) (statements and conduct); *Morris,* 398 S.W.2d at 947 (conduct).

The policy reasons behind litigation immunity compel the conclusion that, to be entitled to litigation immunity, the defendant–attorney's conduct must have occurred in litigation. One of the most well-known maxims of the legal profession is that attorneys must zealously advocate for their clients. *See Bd. of Law Exam'rs v. Stevens,* 868 S.W.2d 773, 780 (Tex.1994) (describing how the Texas Disciplinary Rules of Professional Conduct require attorneys to zealously represent their clients). The courts of appeals have universally reasoned that litigation immunity furthers this goal. *See, e.g., Alpert,* 178

S.W.3d at 405; *Renfroe,* 947 S.W.2d at 288. Without this immunity, an attorney's zealous advocacy at trial would be diluted because the attorney would be forced to balance her own interests against those of her client. *See, e.g., Renfroe,* 947 S.W.2d at 288; *Bradt,* 892 S.W.2d at 72. Ultimately, litigation immunity promotes the ends of justice by ensuring that attorneys can fully develop their clients' cases and pursue all of their clients' rights at trial. *See Morris,* 398 S.W.2d at 947–48. Limiting the application to statements or conduct in litigation serves this ultimate goal without being overly broad and immunizing attorneys for conduct arising from fraudulent business schemes.[2] *See Poole,* 58 Tex. at 137. A limited application of litigation immunity also has the benefit of maintaining procedural safeguards that apply only in litigation. *See, e.g.,* Tex. R. Civ. P. 13 (requiring all of the pleadings, motions, and other papers attorneys file in the lawsuit be signed, certifying that the attorney has read them and believes that they are not groundless and brought in bad faith or to harass, and authorizing sanctions for an attorney's violation of the rule); Tex. Civ. Prac. & Rem. Code §§ 9.001–.014, 10.001–.006 (allowing for sanctions and the offended party's recovery of expenses).

The Court recognizes that this form of attorney immunity traditionally applies in the litigation context and purportedly requires Cantey Hanger's alleged conduct to have occurred in the divorce proceeding.[3] *See* 467 S.W.3d at 482 n.6. But the Court

---

**2.** I agree with the Court's holding that there is no "fraud exception" to litigation immunity. The immunity either applies because the defendant–attorney's conduct occurred in litigation, or it does not apply at all.

**3.** The Court also suggests that this form of attorney immunity applies outside of the litigation context. 467 S.W.3d at 482 n.6. I therefore briefly address the inadequate basis for the Court's suggestion. The two unpublished cases the Court cites are either distinguishable or were erroneously decided. The first, *Campbell v. Mortgage Electronic Registration System, Inc.,* No. 03–11–00429–CV, 2012 WL 1839357 (Tex.App.–Austin May 18, 2012, pet. denied) (mem.op.), held that an attorney was entitled to litigation immunity for his conduct relating to his representation of a lender in a non-judicial foreclosure proceeding. *See id.* at *6. However, the *Campbell* court's statement of the applicable law relied on cases that limit the application of the immunity to "litigation," "lawsuits," or situations in which the attorney may be sanctioned by a court. *See id.* at *5 (citations omitted). The *Campbell* court then implicitly recognized litigation immunity's contextual requirement when it concluded that "[n]either the Campbells' petition nor their response to the motion to dismiss alleged that the Attorney Defendants committed any wrongful acts outside of the foreclosure *pro-*

*ceedings." See id.* at *5–6 (emphasis added). The wording of the court's holding, coupled with the fact that foreclosure proceedings employ specific notice and process protections and may become highly adversarial, demonstrate that the *Campbell* court recognized litigation immunity's contextual requirement. *See* Tex. Prop. Code § 51.002 (mandating that any foreclosure must involve notice to the borrower, occur at a specific time and place (often a courthouse), and provide notice of the sale to the public). The second case the Court relies on, *Reagan National Advertising of Austin, Inc. v. Hazen,* No. 03–05–00699–CV, 2008 WL 2938823 (Tex.App.–Austin July 29, 2008, no pet.) (mem.op.), is also unavailing. There, the court of appeals stated that the attorney immunity doctrine was not "limited to [the litigation] setting," but tempered its statement by holding that the summary judgment evidence established the attorney's alleged conduct occurred in "an adversarial dispute in which litigation was contemplated, impending or actually ongoing." *Id.* at *8. The *Hazen* court's holding harkens to this Court's jurisprudence addressing the judicial proceedings privilege, which applies only in limited contexts. *See Shell Oil Co.,* 464 S.W.3d at 655; *James,* 637 S.W.2d at 916–17; *see also discussion infra* at 492. Therefore, the *Hazen* court's statement that the immunity's application was not "limited to [the litigation] setting" provides no support at all.

conducts very little analysis to determine whether Cantey Hanger's alleged conduct actually occurred in litigation. Instead, the Court summarily concludes that Cantey Hanger's "alleged conduct was within the scope of its representation of Simenstad in the divorce proceedings, was not foreign to the duties of an attorney, and is thus protected by attorney immunity." *Id.* at 485. This conclusory analysis constitutes no analysis at all, and is, in actuality, merely a scope-of-representation test. This scope-of-representation test cannot be the law, or almost anything an attorney does would be protected from civil liability. This is not the law in Texas and is inconsistent with the approach the Restatement adopted. *See Chu*, 249 S.W.3d at 446 (Tex. 2008) ("An attorney who personally steals goods or tells lies on a client's behalf may be liable for conversion or fraud in some cases."); *cf.* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 56 cmt. c (2000) ("[A] lawyer is not always free of liability to a nonclient for assisting a client's act solely because the lawyer was acting in the course of a representation.").

The outcome of this case is dictated by its procedural posture. This case comes to the Court on review of the trial court's grant of Cantey Hanger's motion for traditional summary judgment on its affirmative defense of attorney immunity. The Court correctly states that a party moving for traditional summary judgment has the burden to conclusively prove its affirmative defense, and that reviewing courts "take as true all evidence favorable to the nonmovant, and ... indulge every reasonable inference and resolve any doubts in the nonmovant's favor." 467 S.W.3d at 481 (quoting *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005)). However, a correct application of this standard of review to the summary judgment evidence before us requires a different result.

Cantey Hanger supported its motion with the affidavits of two of its attorneys who swore that Cantey Hanger was "retained to represent Ms. Simenstad in her divorce proceeding," including pursuing post-judgment remedies and claims against Byrd's estate in bankruptcy, and that all of its actions "were made in the course and scope of representing Ms. Simenstad." Cantey Hanger also included the divorce decree in the summary judgment record. The divorce decree awarded Simenstad three aircraft, made Simenstad responsible for the ad valorem taxes, liens, or assessments associated with the aircraft, and required Simenstad's attorneys—by then Cantey Hanger—to prepare any documents necessary to effectuate the transfer of the airplanes within ten days of its entry.

In response to the motion for summary judgment, the plaintiffs submitted an affidavit in which Byrd swore that Simenstad had never been an owner, officer, manager, or director of Lucy Leasing or PGB Air. He also swore that "Cantey Hanger was to draft the documents to effectuate the transfer of the airplane for me to sign on behalf of Lucy Leasing," and that "Simenstad sold one of the airplanes that was awarded to her in the Divorce Decree" over one year after the entry of the divorce decree. Further, Byrd swore that Simenstad signed the bill of sale as a "manager" of Lucy Leasing, which made Lucy Leasing liable for the sales tax incurred by the transaction.

This summary judgment evidence is lacking. The divorce decree was a final judgment that terminated the underlying divorce litigation, *see Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex.2001) (stating that final judgments dispose of all pending parties and claims), and merely establishes that the parties had litigated a

divorce that resulted in each party being awarded certain property. Although divorce litigation arguably could be extended by pursuing post-judgment remedies or an appeal or even by executing documents required by a divorce decree, the summary judgment evidence here does not conclusively establish that Cantey Hanger's alleged conduct occurred in any such extended litigation.[4] The affidavits reveal nothing about whether Cantey Hanger's actions related to any post-judgment remedies or enforcement actions. Even assuming that preparation and execution of documents as provided for in a divorce decree could continue the litigation, Cantey Hanger's alleged drafting of the bill of sale was not the type of transfer document the divorce decree contemplated. The divorce decree contemplated a transfer from Lucy Leasing (a company awarded to Byrd under this decree) to Simenstad within ten days of its entry. Although the trial court struck the bill of sale and we may not consider it, it is uncontroverted in the summary judgment evidence that the airplane was sold more than a year later and the purchaser was a third party. It is also uncontroverted that Simenstad signed the bill of sale, although she may have signed under the Byrd surname and as a manager of Lucy Leasing. The fact remains that the divorce decree contemplated only documents to transfer ownership of the plane from Lucy Leasing to Simenstad, not documents to effectuate a sale from Simenstad to a third party. That the allegedly fraudulent sale may have potential tax implications for a company awarded to Byrd under the divorce decree is inconsequential because, under this record, the litigation had ended and the decree did not address the subsequent sale to third parties of property awarded in the divorce decree.[5]

Viewing this evidence in the light most favorable to and indulging every reasonable inference in favor of the plaintiffs, I cannot conclude, as the Court does, that Cantey Hanger conclusively established that its alleged conduct occurred in litigation. Rather, the summary judgment evidence allows for the reasonable inference that Cantey Hanger's drafting of the bill of sale, if it occurred as the plaintiffs allege, constituted participation in a fraudulent business scheme that took place well after the divorce litigation ended. I therefore conclude that this case is similar to *Poole*, under which the Court held that an attorney was not immune for his involvement in a fraudulent business scheme that arose out of an arguably adversarial relationship between a seller and an insolvent buyer.[6] *See Poole*, 58 Tex. at 135, 137.

---

4. Because of my view of the evidence, I need not address whether or to what extent such post-judgment actions might extend the litigation.

5. In my view, it is nonsensical to hold that Cantey Hanger met its summary judgment burden to establish that its conduct occurred in litigation based on the plaintiffs' response to Cantey Hanger's motion for summary judgment and the attached affidavit alleging tax consequences as a result of the alleged conduct. Cantey Hanger's motion and evidence did not mention taxes or assert any such connection to the divorce litigation.

6. The Court faults this approach, arguing that it improperly focuses on whether the conduct was meritorious. *See* 467 S.W.3d at 485. While it is true that the focus must be on the type of conduct, and not whether that conduct was meritorious, this principle guides courts only in determining whether the alleged conduct involved the provision of legal services, not whether the conduct occurred in litigation. *See Bradt*, 892 S.W.2d at 72 (explaining that if an opposing attorney assaulted the plaintiff during trial, the assault "would not be part of the discharge of the attorney–appellee's duties in representing a party in the lawsuit"). Limiting the type-of-conduct principle to this purpose finds support in this

My conclusion that Cantey Hanger failed to conclusively establish that its alleged conduct occurred in litigation is supported by a comparison to the context in which the judicial proceedings privilege applies.[7] The judicial proceedings privilege is not raised directly, but because Cantey Hanger's motion for summary judgment raised attorney immunity generally, it is helpful to consider the context in which the privilege applies and the policy underlying it.[8] Regarding context, the judicial proceedings privilege requires the attorney's or law firm's statements to have been made in the due course of or in serious contemplation of a judicial proceeding or quasi-judicial proceeding. *See Shell Oil Co.*, 464 S.W.3d at 657–58. This can be established with proof that the statement was made: (1) in the due course of any aspect of a judicial proceeding, including "open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case," *see James*, 637 S.W.2d at 916–17; (2) in the due course of "proceedings before executive officers, and boards and commissions which exercise quasi-judicial powers," *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (Tex.1942); or (3) in serious contemplation of a judicial or quasi-judicial proceeding, *Shell Oil Co.*, 464 S.W.3d at 657–58. Here, Cantey Hanger's affidavits do not indicate whether there was an ongoing judicial or quasi-judicial proceeding, nor do they indicate that Cantey Hanger's conduct occurred in "open court, pre-trial hearings, depositions, affidavits[,] any of the pleadings or other papers in the case," or any other aspect of a proceeding. *See James*, 637 S.W.2d at 916–17. Nor do the affidavits indicate that Cantey Hanger's conduct occurred in serious contemplation of a judicial or quasi-judicial proceeding. *See Shell Oil Co.*, 464 S.W.3d at 657–58.

Court's opinion in *Poole*. In that case, the attorney's presentation of a bill of lading—a document of legal significance—was certainly squarely in the scope of the attorney's representation, but was nevertheless determined to be part of a fraudulent business scheme. *See Poole*, 58 Tex. at 135, 137. I look to all of the evidence surrounding Cantey Hanger's alleged drafting of the bill of sale—also a document of legal significance—and conclude that the alleged drafting occurred outside of litigation. I do not infer or conclude that the alleged drafting did not involve the provision of legal services, and therefore do not run afoul of the type-of-conduct principle.

7. I note that this Court has previously recognized attorney immunity based on the judicial proceedings privilege only for defamation claims, a claim not brought in this case. However, several other jurisdictions have extended the application of their judicial proceedings privilege to both statements and conduct. *See, e.g., Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So.2d 380, 380–81 (Fla.2007); *Price v. Armour*, 949 P.2d 1251, 1258 (Utah 1997). Moreover, other jurisdictions allow their judicial proceedings privilege to shield against causes of action other than defamation. *See, e.g., Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 235, 237 (Colo.1995) (all causes of action except for malicious conduct, fraud, and negligent misrepresentation); *Simms v. Seaman*, 308 Conn. 523, 69 A.3d 880, 890–91 (2013) (all causes of action except for malicious prosecution, abuse of process, and vexatious litigation); *Echevarria, McCalla, Raymer, Barrett & Frappier*, 950 So.2d at 380–81 (all causes of action); *Price*, 949 P.2d at 1258 (intentional interference with business relationships, and noting in dicta that the privilege should apply to all causes of action); *Clark v. Druckman*, 218 W.Va. 427, 624 S.E.2d 864, 872 (2005) (all causes of action except for malicious prosecution and fraud). The effect of the Court's opinion in this case may be an extension of the judicial proceedings privilege to post-proceeding conduct.

8. As it relates to attorneys, the judicial proceedings privilege "is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." RESTATEMENT (SECOND) OF TORTS § 586 cmt. a (1977).

Cantey Hanger did not establish the applicability of the judicial proceedings privilege, just as it did not establish the applicability of litigation immunity.

The Court holds that attorney immunity shields Cantey Hanger from liability arising from its alleged drafting of the bill of sale more than a year after entry of the divorce decree. Instead of limiting this form of attorney immunity to the context of litigation, the Court's cursory analysis implicitly adopts a test in which attorneys are shielded from civil liability to non-clients if their conduct merely occurs in the scope of client representation or in the discharge of duties to the client. This holding enlarges the scope of litigation immunity in a manner that does not comport with its purpose and protects attorneys from liability for conduct involving a transaction foreign to the plaintiffs and the divorce court and outside the context of litigation. This test is not supported by *Poole* or *Kruegel*, is contrary to every published court of appeals opinion on the subject, and has been flatly reject by the Restatement. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 56 cmt. c, 57 (2000).[9]

Moreover, the Court's holding that Cantey Hanger's alleged conduct is not actionable creates a troubling jurisdictional dichotomy on remand. On one hand, the court of appeals' holding that the plaintiffs' fraud claims against Simenstad for "conspir[ing] with Cantey Hanger to falsify an airplane bill of sale . . . are not claims attempting to enforce the terms of the decree" and are therefore not within the continuing, exclusive jurisdiction of the divorce court, 409 S.W.3d at 776, remains

intact because it was not challenged on appeal. On the other hand, the Court holds that the plaintiffs' fraud claims against Cantey Hanger, which are based on the same transaction, are barred because the alleged conduct was within the scope of its representation of Simenstad in the divorce proceeding. 467 S.W.3d at 480. Based on the Court's opinion today and the unchallenged portion of the court of appeals' judgment, Simenstad's alleged conduct regarding the sale of the plane is separate from the divorce proceeding for purposes of the trial court's jurisdiction, but her attorneys' alleged conduct regarding the same transaction is a part of the divorce proceeding for purposes of attorney immunity. This inconsistent results begs the question of whether the trial court on remand actually has jurisdiction over the claims against Simenstad, as the court of appeals held, or whether those claims are within the divorce court's continuing, exclusive jurisdiction.

For its alleged conduct to be protected by attorney immunity, Cantey Hanger must have conclusively established that its alleged conduct occurred in litigation. I would hold that Cantey Hanger did not meet its summary judgment burden and, on this record, the attorney immunity doctrine provides Cantey Hanger no protection from the plaintiffs' fraud, conspiracy, and aiding and abetting claims stemming from the allegedly falsified bill of sale. I would affirm the court of appeals' judgment.

---

9. Texas has not adopted sections 56 or 57 of the Restatement of the Law Governing Lawyers, but the substance of those provisions is consistent with *Chu, Kruegel,* and *Poole. See Chu,* 249 S.W.3d at 446 (recognizing that attorneys may be held liable for conversion and fraud in some cases); *Kruegel,* 126 S.W. at 345 (recognizing a circumstance when an attorney is not liable for fraud); *Poole,* 58 Tex. at 135, 137 (recognizing a circumstance when an attorney is liable for fraud).